Senator Advisement, call our next case, United States v. King et al. May it please the Court, my name is Carl Solanum and I represent the appellant Edward Bogart. With the Court's permission, I would like to request four minutes for rebuttal. That's granted. Thank you, Your Honor. The main issue in this case is whether the trial court erred in holding, as a matter of law, that there can be no recovery from a common fund of $30.4 million that was created by a settlement in litigation filed by Mr. Bogart. We submit that the trial court was wrong, but this is a classic common fund case. Now let me stop you and ask you, when you say this is a classic common fund case, the district court, I think to put it gently, took you to task a little for saying something like that, and the court below had pointed out that you hadn't cited a single case where a key TAM relator had succeeded in getting money from what it characterized as a common fund. And in your briefing you acknowledged you don't have such a piece of authority, not one. The best you can do is to say, well, no case has ever said you can't do it. So help us out here. How is this a classic case? It's a classic fund. I'm sorry, Judge Jordan. It is classic, Your Honor, in that this court has said that someone whose efforts create, discover, increase, or preserve a fund, which I just have a claim, is entitled to a common fund fee. That is what happened here. There is no dispute. I'm sorry, Judge Riedel. I was going to say, we've got two pieces here of this appeal. You've got King and Virginia. Is that correct? Yes, Your Honor. Okay. Now, as against King, there really isn't a common fund claim because there was a relator. I mean, there were relator shares involved here. Is that not correct? I mean, there was a relator fee paid. Your Honor, King was initially brought into the case because it had its own false claims act, and there was a claim for a relator share under that statute. The trial court held that that statute does not apply to the conduct at issue in this case because the statute went into effect after the date of misconduct. That's the Virginia statute. That's Virginia and New Mexico. Both of them. Both of them. Right. Virginia and New Mexico. Let's talk about King. Let's talk about King. I'm sorry, Your Honor. I thought you were asking about Virginia. I was trying to explain about Virginia. No, let's talk about King. How can you recover from King here based on common fund theory? Your Honor, if we were entitled to recover from the common fund before it was dispersed, then the issue that remains before this court is what can equity do to enable us to obtain that recovery after King dispersed the fund? Well, the fund is now in the hand of individuals other than King. Yes, Your Honor. So if you're going to recover from the fund... But the fund no longer exists. Exactly. Well, or arguably, if it no longer exists, then you're really out of luck. But I assume if it exists at all, it exists in the hands of those who have the money and that you need to go against them rather than King if you're going to get the money. What's wrong with that logic? Your Honor, that is one possibility, and we may indeed need to do that. Our authority for saying that we can proceed against King is the only case that we have found anywhere in the country that has dealt with this situation, and that's the Second Circuit's decision in the Savoy case, which held that... But that was a recommendation that the TRO, a preliminary injunction, issued, and then the action was taken.  ...that there would be some equitable lien imposed upon this fund. Did the district court indicate that you had no such claim, thereby signal pretty strongly to King you can pay out? Isn't that the state of the facts? The district court held that there was no entitlement to a common fund here. So what was King to do at that point? Being told by the court that your legal position was wrong, they acted on the court's order. What's the wrongfulness in that behavior that would invoke equity? King knows at that point the following. King knows that there remains a pending claim for fees from the fund. They were not unencumbered funds because the claim was still pending. King knows that that claim remains pending.  No, Your Honor. My point is that it knows that a claim is still pending against those funds. King knows that that claim is still viable because an appeal will be filed, and King has unnoticed that an appeal will be filed. King knows that if it disperses the funds, it will be far more difficult, if not impractical, as the Second Circuit said in the Savoy case, to recover those counsel fees. But how does that give right to a cause of action or any rights in Bogart vis-à-vis King? It gives right, we submit, Your Honor, as a matter of equity. Let us back up for a second. Our position is that, as a matter of equity, we were entitled to a fee from the fund. Is this a fee? Let me get one thing straight. Are we talking about attorney's fees? Weren't the attorney's fees totally paid by the government? No, Your Honor. There was an attorney's fee of $787,000 that was paid for the federal portion of the case. The total time spent in this case was something like $1.6 million. The fees covered about half of that. There were other aspects of the case that were not covered because that was only for the federal portion of the case. So you're only suing for the rest of the $1.6 million, which would be around $900,000 in attorney's fees? No, Your Honor. Your Honor, we're suing for the common fund recovery as a percentage of the $30.4 million that was a benefit created for these states under the common fund doctrine. That's a relator's share. That's not attorney's fees. Common fund cases talk about paying the fees and costs of pursuing the litigation. I think we've got apples and oranges here, don't we? Yes, Your Honor, but common fund fees— I don't mean to argue with you. Thank you, Judge. So the parties of interest here are the attorneys? Parties of interest are the attorneys and their client. Common fund fees, if I may answer, Judge Randall. I'm sorry. Common fund fees are not based solely on the amount of out-of-pocket expenses of the counsel. They are based on a percentage of the recovery, and often they are a multiple of what a lodestar calculation would produce. Well, why didn't you abandon the common fee claim against the key time states and the federal government? I'm sorry, Judge Randall, I didn't understand. The question is, you did not recover counsel fees other than the $788,000 from the federal government and the states that have key time legislation. Yes. And the question is, if that created a common fund, why weren't they paying a percentage of the recovery as counsel fees? Because it was a settlement, Your Honor, and because there were statutes in each case that provided for the recovery that could be obtained from those defendants. So here you're saying that states that have chosen not to pass key time statutes actually ought to owe you more money because of your key time status than states which have passed key time statutes. Your Honor, we're not saying that. But not passing a statute means they owe you more than states that have. Your Honor, we're not saying that they owe us more or they owe us less. We're saying they owe us a reasonable fee as determined under common fund doctrine that would be determined by the trial court under this court's standards for common fund fees. If I may address your question, Judge Jordan, about why we say it's classic. We say it's classic because the entire history of the common fund doctrine says that if someone receives a benefit through the work of others, that they should pay for that benefit to avoid unjust enrichment. Here, these states received $30.4 million for litigation that was brought by Mr. Bogart. There is no question that they didn't even know there was a claim until this litigation was brought by Mr. Bogart. The settlement was made before they even know that the claim existed for $124 million of which they would receive $30.4. The only thing that they had to do was divide up that money among themselves and they didn't just receive the amount by which they were defrauded by King. They got twice that amount. Double recovery. That's why I say it's classic. Doesn't a common fund require, I mean, can you point us to any case where a court is purported to exercise jurisdiction over parties that aren't before it? Your Honor, I think that the main case in which that happened was the Sprague case by the Supreme Court and Justice Frankfurter back in 1935 where the court said that the beneficiaries of the fund were not before the court, that the reason that the court could provide relief was because the party that happened to be a bank that would have the jurisdiction over the fund was before the court and the beneficiary did not have to be there. The other case that we cited in our brief was the Claywalk case out of the Ninth Circuit in which the Alaskan townships that would benefit from the court's decision also were not before the court and the court said that that did not matter. I have one other point on classic, Judge Jordan, and I want to get back to it. The whole idea that there is something unique about this, that council fees are never awarded from a common fund where states are the beneficiaries, we submit is just not accurate. It has been done before in class actions where states are members of the class. It happens, for example, in antitrust cases where you have class actions brought on behalf of purchasers of products that were marketed anti-competitively and states were among those purchasers. I think the main case in this circuit was the five-paper litigation a few decades ago in which there were a number of states that were members of the class. There was the antibiotics case in Minnesota. There was a case a few years ago down in Texas. In each of those cases, in the Texas case, I think even the federal government was a class member, it has never been a holding that council fees cannot be awarded from the common fund, which in this case was created through the class action, merely because states were members of the class. This is not that novel we submit. How would we be able to reach out to these non-QTAM states now and order them to pay any money? Your Honor, you don't have to reach out to the non-QTAM states. Do you concede we cannot issue that kind of order or direction to the trial court? Under the 11th Amendment, the states cannot be made parties in this action, Judge Benaski. I agree with that. That is why, if the court agrees with us that a common fund was created here, that as a result, a benefit was created to which we would be entitled to fees, that King's disbursement of that fund has now made it impractical for us to recover that fee. And that is why, in response to Judge Rendell's earlier question, that is why, as a matter of equity, it is appropriate to say that, under Savoy, King should be responsible to pay for that fund. Thank you, Your Honor. All right. We'll hear from you on rebuttal. Thank you. Now we'll hear for counsel from counsel for King. Mr. Brown. May it please the Court. I am Michael Reynolds, representing the appellees King Pharmaceuticals and Monarch Pharmaceuticals. I've agreed with my co-counsel in the Commonwealth of Virginia, Guy Horsley, who will take five minutes after I do about ten. I'd like to start by responding to one of the references made by the appellant's counsel, that the attorney's fees that were compensated for at the district court did not relate to this non-QUTAM-related claim or efforts by their counsel. Quoting just from their motion for partial reconsideration on the Common Fund, which is at A1035, in the same paragraph, the relater says, the non-QUTAM states, respectfully, did not incur the burden and expense of litigation, as did the relater. The relater committed approximately $800,000 of attorney's time and expense, and the effort which resulted in settlement. So I think it's quite clear that in their earlier submissions for the district court, the relater conceded that the attorney's fees effort was just the $800,000 that King has already paid to the relater. Is there anything in the record that says their actual fees were $1.6 million? No, Your Honor. Have they limited themselves to the $800,000? Well, I believe so, Your Honor. Under the False Claims Act, that was the limit to what they could get, and they signed a stipulation saying that was the complete satisfaction of whatever they were entitled to as a matter of statutory fee. As the district court properly concluded, the appellant's Common Fund theory has no application in a QUTAM case. No court, as the court mentioned earlier today, has ever held that a QUTAM relater is entitled to a Common Fund share of non-QUTAM settlement amounts. This would be a brand new method of recovery for QUTAM relaters for which there's no basis in law. There's also no basis to be pursuing King for this money. The Savoy case, which Judge Jordan referred to earlier as having a report and recommendation that an injunction be issued, clearly is distinguishable from our situation where no injunction ever issued. The preliminary injunction was denied. The appellant did not seek any injunction pending appeal to preserve the status quo. And in fact, the relater signed a stipulation of dismissal, which was so ordered by the court, which indicated that the federal settlement would be paid within 10 days, effectively, of that signing of the dismissal. That was a key term of the federal settlement, of which the relater was aware. And once that happened, the settlement payments to the states would have to be made under their terms on the same day the federal payment was made. So that federal stipulation was February 24th. So within 10 business days of then, King was going to have to pay. At that point, clearly the district court had denied the PI on March 1st. In fact, the district court had denied the relater's motion for reconsideration of the common fund. So it had not just been the subject of one briefing, but two. And the district court had denied, again, that relief. And on March 2nd, the district court also expressly denied the relater's request for a share of the non-QUTAM state settlements, citing, again, that there is no common fund here. Was the global settlement subject to the trial court's approval, the district court's approval, the overall settlement of $124 million? No, Your Honor. The only settlements that were subject to the court's assessment of fairness, adequacy, and reasonableness were the federal settlement and the QUTAM state settlements. And the stipulations quite clearly only identify those settlements as the ones on which the court is saying they are fair, adequate, and reasonable. Now, in the briefing submitted to us, the opposing counsel said, in effect, the district court was wrong to call these individual settlements with the states. This was a group settlement. And the fact that the parties to the settlement chose to paper it state by state doesn't make this less of a common fund. What's your response to that? Well, I think these kinds of settlements occur in the Medicaid context quite frequently. In fact, if you look in this court in the Eastern District of Pennsylvania, the Smith-Klein case, I believe from 1998, there the relater settled with the federal government, which was the only government entity to intervene in the case. Yet there were settlements with 40-something other states related to the Medicaid matter at issue, all with a settlement similar to the one here that may have, in fact, that may have said global in that case. It doesn't say it in our case. And the court found the relater was not entitled to a share of those non-federal settlements because they were not before the court. The only settlement before the court was the federal settlement, which was approved by the court, and the relater's fee was marked off of just the federal amount. Could you characterize the efforts of Bogart as compared to the United States in terms of the prosecution of this case? I'm not as familiar with Quitom as I would like to be, and I'm wondering in this situation exactly. I mean, your typical common fund, the plaintiff takes the laboring or the plaintiff's lead counsel are the ones who really pursue it. And I'm just wondering, as between Bogart and the U.S. here, what happened? Well, Your Honor, from your, obviously, representing King, from your perspective. Well, we have a different perspective on that procedurally because, although I believe, based on the information that we have, that Mr. Bogart's efforts did not result in serious contribution here, and that, in fact, the United States vigorously opposed Mr. Bogart getting a share. They ultimately settled with him. But they took the position, in fact, that he was not an original source. And typically somebody in his position, excuse me, is an informer. Correct. Is that basically what he did, or why were they opposing his payment? The government, from our understanding, was opposing his share on the grounds that a lot of the information that he provided to the government had already been publicly disclosed, which in a quid tem action would deprive the court of jurisdiction over awarding a related share to such a relator. In addition, I believe the government would take the position that the cooperation of King and the independent investigation that King did is what actually resulted in a lot of the resulting settlement amounts. And who interacted with you or with King's counsel? Was it Bogart's counsel? Was it government counsel? How did it work? Well, my partner, Bart Rosenberg, who's sitting at the counsel table, he had, with some of our colleagues at the law firm, the contact with the government. And they negotiated the settlement agreements with the non-quid tem states, the quid tem states, the federal government. Mr. Bogart, by his own admission in his papers, was not involved in those negotiations. Thank you. The Spray case and the Clawitt case, if your honors would like me to address them, relate to trusts. And those are one of the two major types of common fund cases, either class action, which this is not, or trust, which this is not. And in those cases, the bank, which was holding these trust funds, was actually before the court. And so there was no issue of the court not having the jurisdiction to award the relief requested. And the specific decision the court made in those cases related to claims to identical type bonds, and therefore under stare decisis, would have that effect as well. This is not a case here where stare decisis would attach. The relator did not win any motions at the district court to which stare decisis could attach. The claims were dismissed, and the settlements were entered into. And settlements do not have the force of stare decisis. In any event, there are no statutes in the non-quid tem states that allow for a relator or anyone to bring claims on behalf of the non-quid tem states. Interesting aspect here is that had this case gone to trial, there's no way the district court could have awarded any monies from King to the non-quid tem states, as it could have in the case of the quid tem states and the federal government, because there were no claims in the complaint on behalf of those non-quid tem states. The only claim was in paragraph 221 at the very end of the complaint, which was for a share of any settlement amounts that those non-quid tem states might obtain in their own separate dealings with King. In sum, if this court were to find that a common fund can exist in quid tem cases, it would be making new law. New law that deprives states that have elected not to have such statutes. Further, the common fund doctrine is an equitable doctrine, and there's no showing here that King has been unjustly enriched at the expense of Mr. Bogart. And so the application of the doctrine does not work. And as the district court found, there is no inequity in this case. Finally, King has committed no wrongdoing in making the payments that it made, and there's no basis in law to hold King liable for payments of any potential common fund fee when King's actions were lawful and, in fact, required. What's your understanding of the order that is appealed from by Bogart vis-à-vis King that was in error? In other words, what order is—and I'll ask Mr. Solano the same thing—but what exact order vis-à-vis King is complained of? I think in essence it's the denial of a P.I., which is not expressed in a particular order. But there was no denial of the P.I. It's denial of the temporary restraining order. Correct. But we take the position that the P.I. was effectively denied when the court denied the application of the common fund, because that was the only asserted legal basis for the P.I. But we don't have an argument before us as to all the classic irreparable harm, and we're not concerning ourselves with that. So that's curious. Okay, that was for Turner. Thank you, Your Honor. Thank you. We'll hear from counsel for Virginia. Good morning, Your Honor. I'm Guy Horsby with the Attorney General's Office for the Commonwealth of Virginia, representing Virginia's interest in this matter. You can keep your voice up or maybe get closer to the microphone, please. I'm sorry, Your Honor. Thank you, Mr. Horsby. As Your Honor may have noticed, Virginia was sort of left with a bag in this litigation in the sense that we did not settle. Our other states did. The case presents a lot of novel issues in the whole area of key TAM recoveries. The reason that key TAM litigation has never embraced a common fund theory of recovery for attorneys' fees is multifaceted, but it's based in the doctrines of the Eleventh Amendment immunities and the sovereign immunities of the states. One of the things that— Let me ask you a question, if I may. Yes, sir. Mr. Horsby, just to try to take care of this right at the top, your argument. You made an argument against jurisdiction? We made an Eleventh Amendment article of the Charter. Okay. Did she intervene in the suit? We intervened only for the purpose, Your Honor. Once we found out we were named, involuntarily named, once we found out, we intervened for two purposes, one of which was to dismiss because of the settlement that had been reached. So I would suggest that this is not anywhere near the Lapidus case where the state of Georgia voluntarily invoked the jurisdiction of the federal court. You made no claim in the case at all? No claim. So your intervention— We settled separately with— Let's make sure I understand. You're saying that, yeah, we did intervene, but we didn't get all the way in. We're like one foot in, but our right foot was still out on dry ground. Under our statute, as under all the QUTAM statutes, the state, to protect its interest and to reduce the share of the relator, intervenes so that it can protect its share. Okay. Is there some distinction for us to make or some precedent that we would look to to say that, yeah, you can be in for some purposes but not in for other purposes? It can be in jurisdiction but not in jurisdiction. I think there's a huge difference between the Lapidus case, which is the one where the Supreme Court said Georgia had waived its 11th Amendment immunity by invoking the jurisdiction of the court. I think in that case, Georgia affirmatively removed the case. They tried to invoke the 11th Amendment. That was not the case. Sure. I understand that. But you said—what I'm trying to find is do you have some authority for the proposition that you can invoke for some purposes and still not be under the jurisdiction of the court for others? Is there a case like that out there? I don't, Your Honor. I think the underpinnings of my argument as far as the 11th Amendment goes is that the essence of the doctrine is simply that a state cannot involuntarily be forced to pay monetary rewards from public funds, and these are nothing but public funds. Indeed, in the complaint—we were first named in the first amendment complaint and found out about it later—we were later alleged that these funds were simply Virginia's Medicaid public funds. So that's the essence of that. Now, you've also raised sovereign immunity in addition to 11th Amendment issues. Now, even if you've been deemed to consent to be sued in federal court, how does that affect your sovereign immunity argument? It's a problem in all of these cases, Your Honor, in that relators typically do not even attempt to comply with state ketamine statutes. We are in the position of the non-ketamine states simply because the claims in this case on Virginia statutes weren't covered under our particular statute. But the issue is the same, and that is—and that's what Judge Cass found, that in dismissing the claim as to the ketamine states, that the relator made no attempt to comply with those statutes. And that's where sovereign immunity comes in, Your Honor, because our argument is that this is an Erie Doctrine matter, regardless of the 11th Amendment argument. This is—Virginia was brought in on independent jurisdiction, which, under the president of this court, is treated as diversity jurisdiction in terms of the application of the Erie Doctrine. There's no overwhelming, no superseding federal substantive law here. It's Virginia law as to their claim for Virginia's public monies. That being the case, you apply Virginia's substantive law. Under Virginia's substantive law—and I'll brief this, but I'd like to repeat it quickly. Under Virginia's substantive law, common fund recovery doesn't apply for two reasons. One, because the courts of Virginia rule that our doctrine of sovereign immunity would protect Virginia from that claim. Secondly, and since more importantly, Virginia says that when you've got counsel representing the party against whom the recovery is sought, that you don't have the same equities there. And so you have a level playing field, and the common fund doctrine doesn't apply. Of course, the court of law never got to that because it didn't need to. It threw it out of all the grounds. I'm sorry. I don't have time for this. If I may just respond to the point about the amount of fees in the case. The $800,000 fee petition in the record was in mid-1995. The case proceeded through 1996. Excuse me. 2006. 2006, I'm sorry. And I understand that there is a later fee petition in the record at pages 1033 to 39 and 1133. I don't know whether that adds up to the full $1.6 million, but it certainly takes us higher. Judge Rendell, what order is before us? The order that is before the court is the final judgment that the court entered, which is at page 825, which says, All claims and counts, including but not limited to common fund allegations against all states without key TAM statutes, are dismissed. There are no other parties, claims, or counts remaining to be addressed. Therefore, this is a final judgment. We agree with Mr. Reynolds that by entering final judgment, the court in effect denied the preliminary injunction motion at the same time. In effect said there can be no relief with respect to the common fund period. Would you please respond to Mr. Reynolds' argument that, well, summing up a little bit, and I'm using his exact words. In this case, King was obligated to move forward with a disbursement of funds under a settlement agreement that you signed off on. You, meaning your client, and that no stay was sought to prevent their moving forward with disbursement. And therefore, you're singularly ill-positioned to say having moved forward was wrongful. Judge Jordan, with respect to a stay, the motion that was filed was a motion to enjoin disbursement of the funds. So they did move to seek to, in effect, stay or to enjoin disbursement of the funds. Agreed. The motion was not granted. The court's position on that was somewhat confusing. On the same, on the, on December, excuse me, on February 24th, at the time that there was, that Mr. Bogart settled the federal claims, there was a stipulation in between the parties, which recited that the federal claim to relate or share is settled, but the motion for a preliminary injunction is moot as to the federal claims only. That stipulation was entered as so ordered by the district court. On March 2nd, there was the settlement with the key TAM states for that relator's share. That settlement agreement recited that the injunction motion is moot as to all parties, as to the key TAM states only, meaning not moot as to King, which was the only other party to the stipulation. That stipulation was signed by the court as so ordered. So the court agreed that the injunction motion remained pending as of March 2nd. That's the same day that the funds were disbursed. Mr. Bogart tried to, in those various documents, preserve the fact that he was trying to stop disbursement of the funds. Because I may not have the facts clear, I'll ask you to straighten me out. I thought I understood your opposing counsel to say we were obligated to disburse those funds, and it was clear we were obligated to disburse those funds. And Mr. Bogart and his counsel knew we were obligated to disburse those funds. And they did nothing to seek any appellate intervention to prevent us. Now, are those assertions of fact incorrect? Maybe I misunderstood what he was saying, but that's what I understood him to be saying. Are they in error in a historical sense? Judge Jordan, certainly there was a settlement agreement to call for disbursement of the funds. That is correct. As to what did Mr. Bogart do to try to stop the disbursement, he moved for an injunction. The motion was still pending as of the day that the funds were disbursed. And the court had entered an order on that day, in effect, acknowledging that the motion was still pending. It is correct, Judge Jordan, that Mr. Bogart did not seek appellate relief at that point because his injunction motion before the district court was still pending. Supposedly, I mean, frankly, we batted this around ourselves as to what else should have been done in hindsight. I guess he could have moved for mandamus or petitioned for mandamus, but I'm not aware of any rule that says that you must petition for mandamus as a condition to obtain relief in this situation. They did what, again, the only authority that we've been able to find on this subject said to do. That's the Savoy case in the Second Circuit. And the Savoy case said he moved for an injunction. Let me interrupt you just for a second, Mr. Solano. You entered into a stipulation of dismissal, dismissing with prejudice all counts, with the sole exception of the claim to a share from Virginia and the non-party states under the common fund relief, as asserted in paragraph 221 of the third amended complaint. Now, where is there any claim of liability against King asserted in paragraph 221 of the third amended complaint? Paragraph 221 of the third amended complaint says, Your Honor, that it is obviously a third amendment complaint filed against King. King is the defendant. And it says that we are seeking common fund relief with respect to the money that is to be paid by King. And, in fact, it goes on, it contains a long quotation from the Supreme Court's decision in the Boeing case explaining that that money is to come out of the common fund paid by the defendant before it's dispersed. So that's where it comes from. That's what we have to claim against King. Thank you. I have one more question, if it's all right. You've mentioned the Savoy case, but how is this case different or not controlled by the Third Circuit's ruling in the Breedist matter? Breedist versus Spang. The Breedist matter, Your Honor, I'm sorry, Breedist. You say Breedist, I say Breidist. That case, Your Honor, was a case in which, under the ERISA statute, in which the court specifically found that there was a reasonable counsel fee paid under the Lodestar method for counsel's expenses in that case. As I said earlier, the fee, the $787,000 here, was not a reasonable fee because it did not cover all of counsel's expenses. The other distinction is that the counsel fee provision in the Breidist case covered the entire ERISA action, including the class action portion of that case, whereas here the counsel fee provision deals with the federal recovery. It doesn't have anything to do with the state part of the case. Thank you. Thank you very much, Your Honor. Thank you, counsel. We'll take the matter under advisement. Call our next case, United States v. Strickland.